1

2

3                                                          O

4

5

6

7

8                  UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10

11  MARGARET MIRANDA et al.,)        Case No. EDCV 14-00312-VAP
                            )        (DTBx)
12              Plaintiffs, )
                            )        **ORDER:  DENYING Plaintiffs'**
13       v.                 )        **Motion for Summary Judgment**
                            )        **and GRANTING Defendants'**
14  SALLY JEWELL et al.,     )        **Cross-motion for Summary**
                            )        **Judgment**
15              Defendants. )
   _____ )        **[Motion filed on August 28,**
16                          )        **2014]**
                            )
17                          )

18

19       Margaret Miranda and nine of her relatives have asked

20  the Court to review the federal Bureau of Indian Affairs'

    endorsement of the Santa Ynez Band of Chumash Indians'
21
    decision to deny them membership in the tribe.  The
22
    parties filed cross-motions for summary judgment (Doc.
23
    Nos. 20, 25), and after considering the papers timely
24
    filed, the administrative record ("Record"), and the
25
    parties' arguments at the January 12, 2014 hearing, the
26
    Court DENIES Plaintiffs' motion for summary judgment and
27
    GRANTS the government's cross-motion for summary
28
    judgment.

# I.   BACKGROUND

## A.   The Complaint's Allegations

The Santa Ynez Band of Chumash Indians ("SYB" or "Tribe") requires prospective Tribe members to prove their consanguinity before admission to the Tribe. (<u>See generally</u> Compl. ¶ 3.)  If an applicant's "blood degree" exceeds one quarter SYB, roughly meaning at least one of their grandparents is full-blood SYB, the Tribe shall approve their membership. (<u>Id.</u>)  Plaintiffs have been seeking -- for over a decade -- recognition as SYB members.[1]

Plaintiffs originally applied for SYB membership in April 2001. (Compl. ¶ 10.)  Over the next six months they wrote letters to the Tribe and the federal Bureau of Indian Affairs ("BIA") in an effort to receive a response to their applications. (Compl. ¶¶ 11-15.)  The BIA explained in a letter dated October 4, 2001 that the SYB "disapproved [the] applications on July 24, 2001 for insufficient blood degree." (Compl. ¶ 17.)  In August 2002 the BIA responded to further correspondence from Plaintiffs, writing "[BIA] had completed reviewing all of the enrollment applications filed and that BIA Riverside agreed with the [Tribe's] decision that [Plaintiffs'] family did not meet the criteria for membership in the

---

[1] Some Plaintiffs are already SYB members and press a slightly different claim -- they want the Tribe to increase their recorded blood degrees.  Both claims depend on the same questions of law, so the Court treats them together.

1  SYB."  (Compl. ¶ 23.)   After receiving notice from the
2  Tribe of its decision to deny the applications (<u>see</u>
3  Compl. ¶¶ 27, 28), Plaintiffs retained an attorney who
4  attempted in December 2002 to preserve their rights to
5  appeal the decision.  (Compl. ¶ 30.)

6      In December 2012 Plaintiffs filed a federal lawsuit
7  "similar to the present action," which was dismissed for
8  failure to exhaust administrative remedies.  (Compl.
9  ¶¶ 34, 35.)  Plaintiffs went back to BIA in September
10 2013, formally appealing the Tribe's denial.  (Compl.
11 ¶ 36.)  In November 2013 BIA reviewed the Tribe's
12 decision on the merits, and agreed with its outcome and
13 reasoning.  (Compl. ¶ 37.)

14     Plaintiffs brought this case under the Administrative
15 Procedure Act, 5 U.S.C. § 701 <u>et seq.</u>, in February 2014,
16 asking the Court for a declaration that the Bureau's
17 recent denial of their appeals was arbitrary and
18 capricious because BIA allegedly applied an incorrect
19 legal standard and improperly considered certain
20 evidence.[2]  (Compl. ¶ 63.)

21
22
23
24
25
       [2] Defendants in this action include Sally Jewell (in
26 her official capacity as Secretary of the Interior), and
   the United States Department of the Interior.  BIA is a
27 subagency within the Department of the Interior.  This
   Order refers to all Defendants collectively as "BIA" or
28 "Bureau."

**B.   Plaintiffs**

Plaintiffs all descend from Rosie Pace, who was born in 1906.  Plaintiffs allege Rosie Pace was full-blood SYB because she is listed as such on the Bureau's 1940 census roll of the SYB ("1940 Census").[3]  (Compl. ¶ 6.)

Lead Plaintiff Margaret Miranda is Rosie Pace's daughter.  (Compl. ¶ 42.)  Margaret Miranda married Joseph Miranda (who himself is deceased but was half-blood SYB), and gave birth to at least four children, three of whom are Plaintiffs here: Clara Miranda, Rosanna Delphina Miranda, Cyril Miranda (also now deceased), and Cindy Griego.  (Compl. ¶¶ 43-45.)  Six of Rosie Pace's great-grandchildren seek relief as well.  Rosanna Delphina Miranda has at least five children: Helen Herrera, Rose Anna Herrera, Monica Herrera, Micki Herrera, and Inez Alvarez; and Belinda Miranda is Cyril Miranda's daughter.  (See Compl. ¶¶ 46-51.)

**C.   The Motions for Summary Judgment**

As will be explained in greater detail below, SYB law controls Tribal membership.  The Tribe approves or denies a membership application, and that decision may be

---

[3] The Record lists Rosie Pace by a variety of names, all containing some combination of Rosa, Rosie, Pina, and Pace.  Rosie Pace's mother was a full-blood SYB named Inez Pena.  The identity of Pace's father, however, is less clear, which muddies the inquiry into whether she is in fact full-blood SYB, and ultimately affect swhether Plaintiffs meet the Tribal membership criteria (although that is not the issue before the Court).

appealed to BIA. Federal regulations guide BIA's review process.  <u>See</u> 25 C.F.R. Part 62.

SYB law derives from at least two sources, the Tribe's Articles of Organization ("Articles") and tribal ordinances.  Article III governs enrollment and refers to the 1940 Census, but is drafted in broad terms.  SYB Ordinance 2 also deals with tribal enrollment, and operates at a level of greater specificity than Article III.

The 1940 Census lists Rosie Pace (recall Pace is the matriarch of Plaintiffs' family) as "f"[4] in the column labelled "Degree of Blood" (R. 156), but the Tribe's 1965 membership roll records her "Santa Ynez Indian Blood" as only "1/2."  (R. 144.)

Plaintiffs' motion for summary judgment contends the Tribe and the BIA may consult <u>only</u> the 1940 Census to determine the blood degree of a prospective member because Article III refers only to that document. (Pls.' Mot. for Summ. J. at 6.)  In Plaintiffs' view, BIA acted unlawfully by upholding the Tribe's denial because both the Tribe and the BIA considered evidence other than the 1940 Census to determine Plaintiffs' blood degrees. (<u>Id.</u>)  The BIA's cross-motion for summary judgment, in contrast, argues the Tribe and the BIA properly took

---

[4] The parties do not dispute that "f" refers to a person with full "Degree of Blood."  The Court assumes this is the correct interpretation of that notation as it relates to the 1940 Census.

1  account of evidence beyond the 1940 Census to determine
2  Plaintiffs' eligibility.  (Defs.' Cross-mot. for Summ. J.
3  at 13.)  According to the Bureau, a holistic reading of
4  the Tribe's Articles and ordinances authorizes such a
5  result.  (Id. at 10–12.)

6      The BIA did not act arbitrarily or capriciously when
7  it rejected Plaintiffs' appeals from SYB's denials of
8  their membership applications, because the SYB Articles
9  do not limit (to the 1940 Census) the evidence the Tribe
10 or BIA may permissibly consider when making membership
11 decisions.

12

13                 **II.   LEGAL STANDARD**

14     A court shall grant a motion for summary judgment
15 when there is no genuine dispute as to any material fact
16 and the moving party is entitled to judgment as a matter
17 of law.  Fed. R. Civ. P. 56(a); Anderson v. Liberty
18 Lobby, Inc., 477 U.S. 242, 247–48 (1986).  The moving
19 party must show that "under the governing law, there can
20 be but one reasonable conclusion as to the verdict."
21 Anderson, 477 U.S. at 250.

22     Generally, the burden is on the moving party to
23 demonstrate that it is entitled to summary judgment.
24 Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998)
25 (citing Anderson, 477 U.S. at 256–57); Retail Clerks
26 Union Local 648 v. Hub Pharmacy, Inc., 707 F.2d 1030,
27 1033 (9th Cir. 1983).  The moving party bears the initial

28

burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial.  Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 252; see also Schwarzer, Tashima & Wagstaffe, Cal. Prac. Guide: Fed. Civ. Pro. Before Trial § 14:144 (2014).

A genuine issue of material fact will exist "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson, 477 U.S. at 248; Scott v. Harris, 550 U.S. 372, 380 (2007).  In ruling on a motion for summary judgment, a court construes the evidence in the light most favorable to the non-moving party.  Scott, 550 U.S. at 380 (2007); Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991); T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987).


### III.  FACTS

No material facts are in dispute in this case; rather, the outcome turns on whether the BIA correctly interpreted and applied the Tribe's laws.  All facts are taken from the Record.

**A.   The Tribe's Membership Laws**

Two sources of SYB tribal law bear on Plaintiffs' claims to membership, the Tribe's Articles and SYB ordinances.[5]

**1.   SYB Articles of Organization**

Article III of the SYB Articles governs membership in the Tribe, and provides:

Section 1:  Membership in the Band shall consist of:

> A.   Those living persons whose names appear on the January 1, 1940 Census Roll of the [SYB],
>
> . . .
>
> B.   Living descendants of those persons described in Section 1A regardless of whether those persons listed on the census roll are living or deceased, provided that such descendants have one-fourth (1/4) or more degree of Indian blood of the Band.

---

[5] The SYB Articles of Organization (promulgated in 1963 and approved by BIA in 1964) provide a foundational source of tribal law, and are analogous to a constitution.  See Cohen's Handbook of Federal Indian Law § 4.05[3] (2012).  SYB ordinances are more specific and fill the gaps left by the general language of the SYB Articles -- more like a statute or regulation.  See id. § 4.05[5].  The difference between the two, however, may be only a formality because the requirements for amending the Articles and passing an ordinance appear materially similar.  Compare Article VI Sections 3-4 (ordinance enacted by majority vote of General Council where at least 51% of eligible voters cast ballots), with Article IX (Articles may be amended by majority vote of General Council and ratified "in the same manner as" the Articles, which according to Article II of the SYB bylaws means majority vote at a special election called by the Secretary of the Interior and approved by the Secretary) (See R. 205-206, 208, 210.)

Section 2:  The Business Council, as provided for in
            Article IV, shall keep the membership roll
            current at all times . . . by adding the names
            of persons eligible under Article III, Section
            1B.

(R. 201.)

Article VIII lists the General Council's[6] "powers and responsibilities."  (R. 207.)  Article VIII, Section 1.B states the General Council shall have the power to "establish rules or procedures for the conduct of its affairs," including the authority to enact ordinances or resolutions to "control future membership, loss of membership and the adoption of members."  (R. 207-208.)

**2.   SYB Ordinance 2**

SYB Ordinance 2 (adopted in 1965) establishes "regulations and procedures governing the enrollment into the Band and to maintain the roll on a current basis." (R. 215.)  It further explains the official membership roll should be prepared "in accordance with the Articles of Organization."  (R. 215.)

Section 1 of Ordinance 2 defines relevant terms, including:

(F) "January 1, 1940 Census roll of the Santa Ynez
Band," as used in Article III, Section 1.A, of the

---

[6] The General Council is the Tribe's governing body, as provided by Article VI, and comprises "all adult members twenty-one years of age or older."  (R. 202.)

Articles of Organization, shall be the census roll of
the Band prepared by [BIA] as of January 1, 1940;
(G) "Indian Blood of the Band" as used in Article
III, Section 1.B., . . . means the total percentage
of Indian blood derived from an ancestor or ancestors
who were listed on the Santa Inez 1940 Census Roll.
(R. 216.)

Section 3.A of Ordinance 2 explains "[p]ersons who are determined eligible for membership in accordance with the provisions of Article III, Section 1.A, and B," of the SYB Articles "shall have their names placed on the initial membership roll."  (R. 216.)

Section 6 of Ordinance 2 delineates the Enrollment Committee's[7] process for deciding whether to approve or deny an application for membership, and it states: "[t]he Enrollment Committee shall review and arrive at a perliminary [sic] decision as to the eligibility of the applicant based upon tribal records, information presented in the application or other sources of information."  (R. 218.)  The Enrollment Committee then must "refer the application" to BIA for a "review of the Bureau records for any additional data which would either

---

[7] The Enrollment Committee is a five-member group appointed by the Business Council, which in turn is a five-member group of elected SYB members.  (R. 202, 216.) Under Article IV, the General Council delegates manifold duties to the Business Council, such as "effectuat[ing] all tribal approved ordinances," dealing with the federal government, retaining legal counsel on SYB's behalf, and calling General Council meetings.  (R. 202, 203.)

1    substantiate or refute the preliminary decision of the
2    Committee." (R. 218.)  BIA must respond to the
3    Enrollment Committee via written statement with
4    "information found in Bureau records relative to the
5    eligibility of the applicant," and after the Enrollment
6    Committee receives BIA's statement it shall "on the basis
7    of the evidence thus accumulated, approve or disapprove
8    the application." (R. 218.)

9        The Enrollment Committee must advise a "person
10   disapproved for enrollment . . . in writing of the
11   reasons for the action," and that the decision "may be
12   appealed" to the regional "Director"[8] of the BIA (but
13   such an appeal must be made "within thirty (30) days
14   following receipt of a rejection notice"), and may be
15   further appealed, if necessary, to the "Commissioner" of
16   the BIA, according to Ordinance 2, Section 7.  (R. 218.)
17   Ordinance 2 does not specify the criteria by which BIA
18   ought to evaluate appeals of disapprovals of membership.

19       Ordinance 2's Section 10 instructs the Business
20   Council "to keep the membership roll current by
21   . . . [m]aking corrections to the roll, such as
22   correcting dates of birth, degree of Indian blood, family

23

24

25      [8] Ordinance 2 defines "Director" as the "Area
26   Director, Bureau of Indian Affairs, Sacramento Area
     Office," and "Commissioner" as the "Commissioner of
27   Indian Affairs." (R. 215.)  Both definitions correspond
     with the meanings given to those terms by the Code of
28   Federal Regulations.  See 25 C.F.R. § 62.1.

relationship, etc., provided such corrections are supported by satisfactory evidence."  (R. 219, 220.)

**B.   Other Relevant Tribal Documents**

SYB Article III instructs the initial membership roll for the Tribe to consist of the individuals listed on the 1940 Census (which was prepared by the BIA).  The 1940 Census counts Rosie Pace among the Tribe's members, and lists her "Degree of Blood" as "f."  (R. 156.)

In July 1965, two years after the Tribe enacted its Articles, Rosie Pace applied for membership in the Tribe in accordance with SYB Ordinance 3.  (R. 164.)  Rosie Pace wrote on her application that her father is Mike Valencia, but left blank the space available to indicate Valencia's "Total Santa Ynez Blood." (R. 164.)  On the line immediately below the Valencia entry, Pace marked her mother's total SYB blood as "F."  (Id.)  The application received preliminary approval on July 18, 1965, and bears a notation stating "Blood degree is wrong -- should be 1/2," and was finally approved on September 28, 1965.

The BIA approved the Tribe's 1965 initial "Official Membership Roll" in November 1970 (R. 136); the 1965 roll records Rosie Pace's "Santa Ynez Indian Blood" as "1/2." (R. 144.)

**C.   BIA's Denial of Plaintiffs' Appeals**

The Bureau denied Plaintiffs' appeals in a four-page letter to their lawyer dated November 21, 2013.[9]  (R. 1.) The denial letter begins by quoting Article III's two sections (listing membership criteria), and then recites SYB Ordinance 2's definition of "Indian Blood of the Band."  (R. 2.)  The BIA next agrees that Plaintiffs descend from Rosie Pace, and that Pace "appeared on the [1940 Census], which lists her degree of Indian blood as 'f' (4/4)."  (R. 2.)  The Bureau's denial letter then advised: "[t]he appeals before this office stem from the preparation and approval of the 1965 Base Roll of the Santa Ynez Reservation, wherein it was determined by the Santa Ynez Enrollment Committee, and approved by the Sacramento Area Director, that Rosa Pena (Valencia) Pace, was 1/2 Santa Ynez Indian Blood," and thus Plaintiffs' claims to membership or increased blood quanta fail.  (R. 2.)

The BIA canvassed the Record to determine the identity of Rosie Pace's father, and found (in agreement with the Tribe's enrollment committee), that her father was Michael Valencia, who was non-Indian.  (R. 2.)  The evidence weighed by the BIA includes: (1) a 1928 Roll of

_____

[9] The Record contains a great deal of additional correspondence among Plaintiffs, tribal officials, and BIA officials.  The Court focuses on the final denial letter to Plaintiffs from the Bureau because that document constitutes the final agency action for which Plaintiffs' seek APA review in this lawsuit.

California Indians (contains no information); (2) the BIA-prepared 1940 Census (contains no information); (3) Rosie Pace's 1965 SYB enrollment application (identifies Michael Valencia as Pace's father); (4) Rosie Pace's application for the 1968 California Judgment Fund Roll of California Indians, completed and signed by Pace (identifies Michael Valencia as Pace's father); (5) Pace's 1982 baptismal certificate (identifies Michael Valencia as Pace's father); (6) Pace's 1993 baptismal certificate (contains no information); (7) a second 1993 baptismal certificate (identifies Michael Valencia as Pace's father); (8) a 1996 Pace affidavit (identifies Guillermo Cordona as Pace's father); (9) 1999 Delayed Registration of Birth for Rosie Amelia Pina-Valencia, issued by the California Department of Health and Human Services (identifies Guillermo Cordona as Pace's father, relying on 1993 baptismal certificate that bore no paternal identifier, 1940 Census, and a Social Security document not in the Record).  (R. 3.)

The Bureau's denial letter then explains why the BIA does not credit evidence provided by Pace or her descendants that purports to show Pace's father was an Indian (SYB or otherwise), mainly stating "[t]here have been no documents submitted by people with an obvious or inferable knowledge of Rosa Pena (Valencia) Pace's parentage." (R. 3.)  The BIA also justifies its use of evidence extrinsic to the 1940 Census: "there is no

14

1  requirement in the [SYB Articles or Ordinance 2]

2  . . . for the Enrollment Committee to utilize the degree

3  of Indian blood listed for any individual on any document

4  prepared by the United States for the purpose of

5  determining an individual's degree of Indian blood for

6  enrollment."  (R. 3.)

7       The BIA's letter concludes by noting "BIA gives

8  deference to tribes' reasonable interpretations of their

9  own laws,"[10] and states SYB "made a reasonable

10  interpretation of its own laws in determining the degree

11  of Indian blood for Rosa Pena (Valencia) Pace."  (R. 4.)

12

13                    **IV.  DISCUSSION**

14  **A.  Review of BIA Action Under the Administrative**

15       **Procedure Act**

16       Chapter 7 of the Administrative Procedure Act

17  ("APA"), 5 U.S.C. §§ 701-706, provides a limited waiver

18  of sovereign immunity to litigants seeking review of

19  final federal agency action.  The APA requires a

20  reviewing court to "hold unlawful and set aside agency

21  action . . . found to be –- (A) arbitrary, capricious, an

22  abuse of discretion, or otherwise not in accordance with

23  law."  5 U.S.C. § 706(2)(A); Citizens to Preserve Overton

24

25 ──────────────

26       [10] The BIA cites Cahto Tribe, 715 F.3d at 1231, to
   support its argument for deference to the Tribe's
   decision.  That proposition actually occurs at 715 F.3d

27  at 1230 n.9 ("The agency concedes that the BIA gives
   deference to tribes' reasonable interpretation of their

28  own laws.").

1   Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).  Section
2   706(2)(A)'s standard of review is "highly deferential."
3   Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv., 475
4   F.3d 1136, 1140 (9th Cir. 2007).  "Agency action is
5   presumed to be valid and must be upheld if a reasonable
6   basis exists for the agency decision."  Peck v. Thomas,
7   697 F.3d 767, 772 (9th Cir. 2012).  An agency need only
8   "consider[ ] the relevant factors and articulate[ ] a
9   rational connection between the facts found and the
10  choices made."  Ranchers Cattlemen Action Legal Fund
11  United Stockgrowers of Am. v. U.S. Dept. of Agric., 415
12  F.3d 1078, 1093 (9th Cir. 2005).  An agency must support
13  its action based only on the administrative record, and
14  may not substitute "[p]ost hoc explanations . . . by
15  appellate counsel . . . for the agency's own articulation
16  of the basis for its decision."  Arrington v. Daniels,
17  516 F.3d 1106, 1113-14 (9th Cir. 2008) (citing Motor
18  Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463
19  U.S. 29, 50 (1983); Fed. Power Comm'n v. Texaco, Inc.,
20  417 U.S. 380, 397 (1974)).

21      Federal courts normally play no part in the
22  adjudication of tribal disputes because "Indian tribes
23  are distinct, independent political communities,
24  retaining their original natural rights in matters of
25  local self-government."  Santa Clara Pueblo v. Martinez,
26  436 U.S. 49, 55 (1978) (internal quotation marks
27  omitted).  This federal hands-off policy extends to
28

controversies over tribal membership.  <u>Alto v. Black</u>, 738 F.3d 1111, 1115 (9th Cir. 2013) ("In view of the importance of tribal membership decisions and as part of the federal policy favoring tribal self-government, matters of tribal enrollment are generally beyond federal judicial scrutiny."); <u>see also</u> Cohen's Handbook of Federal Indian Law § 3.03[3] (2012) ("Courts have consistently recognized that one of an Indian tribe's most basic powers is the authority to determine questions of its own membership.").

The APA empowers federal courts indirectly to review tribal enrollment decisions, however, by authorizing scrutiny of BIA action that in turn reviews a tribe's membership determination.  The BIA examines tribal enrollment decisions only when tribal law explicitly permits such review.  <u>Cahto Tribe of Laytonville Rancheria v. Dutschke</u>, 715 F.3d 1225, 1228 (9th Cir. 2013); 25 C.F.R. § 62.2(b)(2) (allowing the BIA to consider an appeal only when one "is provided for in the tribal governing document").  According to the Code of Federal Regulations, "Tribal governing document" means "the written organizational statement governing a tribe, band or group of Indians and/or any valid document, enrollment ordinance or resolution enacted thereunder." 25 C.F.R. § 62.1.  Courts construe narrowly a tribe's governing document when determining whether it permits an applicant to appeal to BIA.  <u>See Cahto Tribe</u>, 715 F.3d at

1239 (holding BIA lacked authority to review tribe's
disenrollment decisions, notwithstanding tribal
document's provision of right to appeal adverse
enrollment decisions).

**B.   The Bureau's Action was not Arbitrary or Capricious**

This Court has jurisdiction to review the BIA's
endorsement of the Tribe's denial of Plaintiffs'
membership applications because SYB Ordinance 2
explicitly grants an applicant the right to appeal to the
federal government from an adverse decision by the Tribe.
(See R. 218-19.)  The BIA's approval of the Tribe's
decision amounts to final agency action, see 25 C.F.R.
§ 62.10 ("[t]he Director shall make a decision on the
appeal which shall be final for the Department"), so the
Court may review that action under the APA.  5 U.S.C.
§ 704.

**1. The BIA's Reasons for Denying Plaintiffs' Appeal**

The Bureau's denial letter offers two reasons for its
support of the Tribe's decision.  First, the BIA surveyed
the Record for evidence of Rosie Pace's parentage and
found the Record does "not show her father to be of
Indian descent."  (R. 3.)  And because "there is no
requirement" in the SYB Articles for the Tribe to rely
only on a "document prepared by the United States for the
purpose of determining an individual's degree of Indian
blood for enrollment," SYB law counseled the BIA to

consider evidence apart from the 1940 Census.  (R. 3.)
The BIA's letter provides a second and independent ground
for upholding the Tribe's decision: the agency deferred
to the Tribe's "reasonable interpretation of its own laws
in determining the degree of Indian blood" for Rosie
Pace.  (R. 4.)   Neither rationale was arbitrary or
capricious.

   **2.   The BIA Reasonably Deferred to SYB's Decision**

   The Bureau stated it deferred to the Tribe's
decision[11] because it was a reasonable one.   The Tribe
referenced its internal tribal records (the 1965
membership roll) and compared them to the standard in SYB
Article III (requiring at least 1/4 SYB blood degree),
and found Plaintiffs came up short of that benchmark.
The Tribe's Enrollment Committee considered Plaintiffs'
evidence and explained in a written response that they
did not qualify for membership based on data contained in
foundational tribal documents.   In the BIA's view, that
finding was reasonable, so it deferred to the Tribe's
judgment.   Where such deference is based on a reasonable
application of tribal law, as will be explained below,
the Bureau's deference hardly indicates caprice.   Rather,

---

   [11] The Tribe based its rejection on Plaintiffs'
inability to provide sufficient evidence in support of
the required blood quantum.  (See, e.g., R. 47.)   The
Tribe's Enrollment Committee relied on the blood quanta
recorded on the Tribe's 1965 membership roll, and did not
limit its inquiry to the 1940 Census.  (Id.)

it furthers the federal policy that encourages tribal self-government.

The Bureau's deference accords with the general jurisdictional rule that allocates to tribes near-absolute primacy to make membership determinations. <u>See</u> <u>Santa Clara Pueblo</u>, 439 U.S. at 56-57; <u>Cahto Tribe</u>, 715 F.3d at 1226.  The BIA's deference to the Tribe gains further support from the Bureau's longstanding policy to respect tribal membership decisions. <u>See</u> <u>Cahto Tribe</u>, 715 F.3d at 1230 n.9 (citing formal BIA adjudication <u>United Keetowah Band of Cherokee Indians in Oklahoma v.</u> <u>Muskokee Area Director</u>, 22 IBIA 75, 80 (June 4, 1992)).

### 3.  It was Reasonable for the BIA to Consider Evidence Extrinsic to the 1940 Census

Even if the BIA did not defer to the Tribe's decision, it did not violate SYB law by considering evidence other than the 1940 Census in its review of Plaintiffs' appeals.

The rationale underlying both the Tribe's and the BIA's denials of Plaintiffs' applications and appeals -- that is, tribal eligibility determinations may consider evidence apart from the 1940 Census -- flows from both a strict textual reading of the SYB Articles as well as a broader, more integrated application of the Tribe's laws.

Plaintiffs propose a literal interpretation of SYB Article III.  Their theory goes like this: Section 1.A states that the individuals on the 1940 Census embody the

Tribe's foundational membership, Section 1.B admits all
descendants of individuals listed on the 1940 Census (as
long as the descendant has adequate "Indian Blood of the
Band"), therefore an applicant's blood degree must be
measured by <u>only</u> the values listed on the 1940 Census.
But that conclusion does not follow.

Section 1.B requires two distinct conditions be met
for membership beyond those persons listed on the 1940
Census.  First, the applicant must descend from a "person
described in Section 1 A," and second, she must possess
1/4 SYB blood.  Article III provides no method for
measuring Indian blood of the Band –– the 1940 Census
supplies the standard for the first criterion but not the
second.  In other words, the 1940 Census starts the
membership inquiry but does not end it.  If the Articles
drafters wanted the 1940 Census to provide the sole basis
for an applicant's blood degree they could have written
"Indian blood of the Band, according to the 1940 Census."
Instead, they left open the approach to determine blood
quanta for membership purposes.  Rather than leading to
their desired result, Plaintiffs' theory of strict
interpretation points in the opposite direction.

A broader view of the Tribe's legal documents, which
makes good sense in light of Article III's unmodified
"Indian blood of the Band," suggests that SYB Ordinance 2
regulates the process for establishing an applicant's

1  blood quantum.[12]  Enacted roughly contemporaneously with
2  the Tribe's Articles, Ordinance 2 offers a detailed set
3  of procedures to govern "the enrollment of members into
4  the Band and to maintain the roll on a current basis."

5      Ordinance 2's definitions section takes care to
6  define "Indian Blood of the Band," which provides
7  evidence that the same Tribe members who enacted the
8  Articles thought it necessary to give meaning to the
9  potentially opaque term.  The definition it provides does
10  not rely on the listed blood quanta from the 1940 Census,
11  although, to be sure, it does plainly say the relevant
12  SYB blood must <u>derive from</u> an ancestor listed on it.  (R.
13  216.)  Section 6 directs the Enrollment Committee to
14  consider all relevant tribal records or "other sources of
15  information."  (R. 218.)  Taken together, the SYB
16  Articles and ordinances require the Enrollment Committee,
17  and the Bureau, to look at all relevant evidence when
18  making a membership determination.  Any reading of
19  Article III, Section 1.B to the contrary ignores the
20  structure of SYB law and imposes an extra-textual
21  bureaucratic limit on matters that properly fall under
22  the exclusive province of tribal decision-making.

23      Plaintiffs rely on <u>Allery v. Swimmer</u>, 779 F. Supp.
24  126 (D.N.D. 1991), to support their argument that the
25  Tribe or the Bureau may only consider the 1940 Census.

26  _____

27      [12] The BIA's own definition of "Tribal governing
   document" counsels such a broad approach.  <u>See</u> 25 C.F.R.
28  § 62.1.

In _Allery_ the court reviewed the BIA's "recalculat[ion]" of the tribe's foundational 1940 membership roll for the Turtle Mountain Band of Chippewa Indians, which the Bureau undertook to distribute judgment funds to individual tribe members in accordance with the Act of December 31, 1982, Pub. L. 97-403, 96 Stat. 2022. _Allery_, 779 F. Supp. at 127.[13]  The BIA created an original roll for the Turtle Mountain Band in 1940, pursuant to the Act of 1940, Pub. L. 76-520, 54 Stat. 219.[14]  _Id._  In 1983 the BIA went back and altered entries on the original 1940 membership roll to make its judgment fund distributions as accurate as possible.  _Id._  The court ruled the BIA's alterations impermissible, because the 1982 "Act in no way [gave] the Bureau the authority to re-prepare the [1940] roll."  _Id._ at 128.  In so holding, the judge also wrote that all blood-degree calculations by the BIA related to keeping the Turtle

---

[13] The reported decision of the _Allery_ case does not indicate which statute provided the cause of action, but it does explain the plaintiffs "allege[ ] that [BIA] does not have the authority to alter the tribal roll established in 1940, pursuant to the Act of 1940."  779 F. Supp. at 127.

[14] The Turtle Mountain Band adopted the 1940 roll as its foundational document: its constitution provides the band's membership would be composed of: "(a) All persons whose names appear on the roll prepared pursuant to Section 2 of the Act of May 24, 1940 (54 Stat. 219), and approved by the Secretary of the Interior on March 15, 1943" and "(b) All descendants of persons whose names appear on the roll defined in Section 1(a) of this article, provided that such descendants possess one-fourth or more Indian blood, . . . ."  779 F. Supp. at 128.

23

Mountain roll current must respect the blood degrees
listed on the 1940 roll.[15]  Id. at 129–30.

Plaintiffs argued at the hearing that affirming the
BIA's action in this case risks creating tension with
Allery's holding.  Not so.  Allery is different from this
case for a number of reasons, but the one that matters
most is that in Allery the court reviewed the BIA's
application of a federal statute; in contrast, the Court
here reviews (for reasonableness) the BIA's review of the
Tribe's interpretation of their own law, for which the
Bureau has a long-standing policy of deference.[16]  The
difference in procedural posture is no mere technicality.
Allery subjected the Bureau's action to exacting
scrutiny.  Here the Court's standard of review is highly
deferential.  And, in addition, the BIA treads lightly
when reviewing any tribe's interpretation of its own
membership laws -- especially when the Bureau has no
clear standard upon which to base its decision.

_____

[15] Importantly, the Turtle Mountain constitution
delegated to the BIA the responsibility to keep its
membership roll current.  See 779 F. Supp. at 128.

[16] Two other relevant distinctions are worth
mentioning.  First, in Allery the BIA attempted to
reconstruct the entire 1940 census roll, in direct
conflict with the Turtle Mountain Band's constitution;
here, the BIA is not trying to alter the 1940 Census,
instead it looked outside the 1940 Census at relevant
evidence in order to review effectively the Tribe's
enrollment decision.  Second, the Turtle Mountain
constitution delegates authority to the BIA to keep its
roll current, but the SYB Articles assign that authority
to the Tribe itself, compare 779 F. Supp. at 128, with R.
202, which supports the view that the federal government
should respect the Tribe's decision.

1    In the absence of a clear directive in the SYB
2 Articles that blood degree of prospective members should
3 be determined based only on the blood degree of an
4 ancestor as listed on the 1940 Census, the Court declines
5 to second guess the Bureau's reasonable decision to apply
6 SYB law in the same manner in which the Tribe applied it.
7    The BIA correctly considered the entire Record when
8 denying Plaintiffs' appeals, so its decision was not
9 arbitrary or capricious.

10

11                    **V.   CONCLUSION**

12    The Bureau's action was reasonable.  Accordingly, the
13 Court DENIES Plaintiffs' motion for summary judgment, and
14 GRANTS Defendants' cross-motion for summary judgment.

15

16    **It is so ordered.**

17

18

19 Dated:  _January 15, 2015_          _____
20                                      VIRGINIA A. PHILLIPS
                                       United States District Judge

21

22

23

24

25

26

27

28

                            25